UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| JANE DOE, by and through C.B., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2: 23-151-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| DIOCESE OF COVINGTON, et al., | ) | **MEMORANDUM ORDER** |
| | ) | **AND OPINION** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendants Diocese of Covington ('the Diocese"), St. Joseph Catholic Church ("St. Joseph"), and Monsignor Gerald Reinersman ("Reinersman") have moved for summary judgment on all claims not dismissed previously. [Record No. 75] The defendants' motion will be granted for the reasons explained below.

**I.**

C.B. is the mother of Jane Doe, an African American student who suffers from dyslexia and a nonverbal learning disorder. Doe attended the eighth grade at St. Joseph Catholic School which operates as part of the Catholic Diocese of Covington. The plaintiff's claims stem from alleged bullying Doe experienced from classmates due to her race and disability and several incidents with her teacher, ClyDenna Hehman, including an incident during which Mrs. Hehman used the "N-word" as part of a lesson on racial prejudice.

The first incident is alleged to have taken place on March 29, 2023, when Doe claimed a male student whispered the "N-word" in her ear when she refused to share her answers on an assignment. [Record No. 47 at p. 29] Following the incident, Doe met with Emily Urlage,

the school principal.  Although Doe believed Urlage "didn't really do anything," Urlage took the incident seriously and investigated.  [Record No. 73 at p. 3] Urlage immediately contacted C.B. and informed her that the school understood the severity of the matter and would take appropriate action.  [*Id.*]  Principal Urlage then met with the school guidance counselor and discussed the matter with the student who allegedly used the word, as well as another student who was a potential witness.  [*Id*. at p. 7]  Both denied the allegation and, as a result, the claimed offending student was not disciplined.  [*Id.* at p. 6-7]

Doe contends that another incident occurred on April 17, 2023, when Hehman asked the eighth-grade class, "Do we have any black students in this class?"  [Record No. 47 at p. 35]  Doe claims she was embarrassed and felt singled out, however, she did not raise her hand to note that she was African American. [*Id.*][1]  Thereafter, on April 18, 2023, Hehman taught a lesson concering racial prejudice which centered around a book entitled "*Blindsided: The Life and Times of Sam Mihara,*" the story of a Japanese American growing up during Japanese internment following the Pearl Harbor attacks.  [Record No. 75-1 at p. 5-6] Hehman began the class by writing the phrase "NO JAPS" on the classroom white board and passing around a photo of sign captioned, "No Japs," while explaining that "Jap" was an offensive term to describe Japanese people.  [*Id.*] The parties dispute what followed.  Hehman testified that she compared "Jap" to two other racial slurs, including the "N-word," but Doe explained that she did not recall any other slurs being used besides the "N-word."  [Record No. 47 at p. 44] The parties agree that Hehman did not specifically call Doe the "N-word."

---

[1] Doe's father is African American but has not been involved in Doe's upbringing.

On April 19, 2023, Doe's stepfather approached Principal Urlage during student drop-off and the two later met.  During the meeting, Urlage promised to investigate the situation. [Record No. 73 at p. 11] Urlage then discussed how to proceed with Reinersman, the head of the parish responsible for hiring the school principal.  Another investigation ensued.  [Record No. 73 at p. 12] Urlage first met with Doe.  And after hearing her side of the story, Doe was moved to another English class.  [Record No. 73 at p. 12] Next, Urlage met with another student in the English class who discussed Hehman's use of racial slurs.  Thereafter, she met with the student who rode in an elevator with Hehman and Doe shortly after the alleged incident.  [*Id*]

After speaking with the students, Urlage and the Assistant Principal met with Hehman. During this meeting, Hehman admitted to using the "N-word" in its entirety, along with other racial slurs, while teaching a lesson about racial prejudice.  [*Id.* at p. 15] Urlage informed Hehman for the first time that Doe was African American.  At this point, Hehman realized that she needed to apologize to Doe. [Record No. 70 at p. 49]

The following day, C.B. met with Urlage and Hehman. [Record No. 73 at p. 17] Urlage attempted to explain the educational context in which the slur was made and advised C.B that she had addressed the previous incident with the offending student to the best of her ability. [*Id.*]  Urlage continued to investigate the matter, which included a meeting with the Assistant Principal and additional students in Doe's English Class.  [Record No. 73 at p. 18] Urlage concluded that, while Hehman's use of the "N-word" was inappropriate, Hehman was attempting to teach about racial prejudice and could not have intended to offend or discriminate against Doe.  [*Id.* at p. 19] Later, on April 20, 2023, Urlage met with C.B., Doe's stepfather, Hehman, Reinersman, and the Assistant Principal.  [*Id.* at p. 20] The school arranged for

- 3 -

Hehman to apologize to Doe in person, but C.B. advised Urlage that she was not comfortable with such a meeting. As a result, Hehman wrote a note to Doe which was read to her by Urlage. [*Id.* at p. 21-24]

After the series of meetings with C.B., Doe, Urlage and the Assistant Principal, Urlage met on April 26, 2023, with the concerned parent of another child who had heard rumors about the situation. This prompted Urlage to continue the investigation by meeting with students in Hehman's sixth and seventh grade classes, another eighth-grade student, and Doe's homeroom teacher. [*Id.* at p. 25] These additional meetings, however, did not change Urlage's conclusion that Hehman did not have any racially discriminatory intentions. And given that Hehman had apologized to Doe, she concluded that disciplinary action was not necessary. [*Id.* at p. 25] But in a continued effort to make Doe feel more comfortable, the school removed Hehman as a chaperone from the eighth-grade class trip. [*Id.*] Further, Urlage arranged for additional training for the faculty regarding cultural diversity. [*Id.*]

In addition to the steps taken by St. Joseph to investigate the above allegations, the Diocese conducted its own investigation led by Superintendent Kendra McGuire. [Record No. 74 at p. 5] McGuire met with Urlage on two occasions to determine whether the school had sufficiently investigated and responded to the matter. [*Id.* at p. 6] Additionally, she met with Hehman to hear her account of the incident. [*Id.* at p. 7] Following these meetings, McGuire concluded that St. Joseph had handled the matter appropriately and that no further action was needed. This decision was relayed by McGuire to C.B. on May 2, 2023. [*Id.* at P. 10]

Doe graduated from St. Joseph on May 19, 2023, less than a month after the incidents. [Record No. 73 at p. 34] Hehman did not attend the graduation ceremony. [*Id.*] And according to Hehman, during the time leading up to graduation, she "made the effort to know where

- 4 -

[Doe] was so she did not have to see [Hehman] and feel uncomfortable." [Record No 70 at p. 60]

One notable incident occurred during a Friday all-school mass during which Doe found herself in line to receive communion from Hehman who was volunteering to assist as a communion server. [Record No. 47 at 63] Doe testified that Hehman held up the wafer, but did not say "the body of Christ." Instead, she simply held up the wafer and placed it in Doe's hands. [*Id.*] Beyond this incident, Doe and Hehman would occasionally see each other in passing but they did not speak. At most, the two merely made awkward eye contact. Notwithstanding the above incidents, Doe decided to attend a Diocesan high school following graduation from St. Joseph. [Record No. 47 at p. 78]

## II.

The plaintiff initially filed a nine-count complaint against the Diocese, St. Joseph, Hehman, Reinersman, and Does 1-20. [Record No. 1] However, on May 10, 2024, the Court dismissed the five claims against Hehman, the five claims against the Doe defendants, six of the seven claims against Reinersman, and four of the eight claims against the school and the Diocese. [Record No. 30] The remaining claims include race discrimination in violation of Title VI against St. Joseph and the Diocese (Count I); race discrimination in violation of 42 U.S.C. § 1981 against St. Joseph and the Diocese (Count II); disability discrimination under 29 U.S.C. § 701 against the Diocese, St. Joseph, and Reinersman (Count IV); and negligence against St. Joseph, the Diocese and Reinersman (Count VI).

## III.

Summary judgment is appropriate if there are no genuine issues as to any material facts and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323-25 (1986). A genuine dispute regarding a material fact exists if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Olinger v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 522 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

The moving party has the initial burden of demonstrating the basis of its motion and identifying the parts of the record that establish the absence of genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 325; *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). If this burden is met, the nonmoving party must come forward with specific facts from the record to show that there is a genuine issue of material fact in dispute. *Id.* at 424. The Court then determines "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 447 U.S. at 242. In making this decision, the Court construes the facts and draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**IV.**

**A.**

The plaintiff has alleged two theories of recovery under Count I (Race Discrimination in violation of Title VI of the Civil Rights Act). She contends that Doe was a victim of student-on-student racial harassment and teacher-on-student harassment. However, the plaintiff has failed to meet her burden to show that Doe is a victim of either type of harassment.[2]

---

[2] Before reaching the merits of the plaintiff's theories of recovery under this Count, the Defendants contend they are entitled to summary judgment because plaintiff has failed to demonstrate they are recipients of federal funding. However, the plaintiff has shown indicia that the defendants receive federal funding as demonstrated by their publicly available

**i.**

To prevail on plaintiffs' theory that Jane Doe was a victim of student-on-student harassment, the plaintiffs must "prove, that the school had actual knowledge of actionable [racial] harassment and that the school's deliberate indifference to it resulted in further actionable harassment[,] … which caused the Title [VI] injuries." *Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613, 618 (6th Cir. 2019). Under this theory, the plaintiff can only recover only if "the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999). The source of the harassment must be "something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass." *Kollaritsch*, 944 F.3d at 620. Instead, the plaintiff must also show that the school's response was "clearly unreasonable and led to further harassment." *Id.* at 622.

Doe's allegation in support of the peer harassment theory is her classmate's purported use of the "N-word." But even taking the facts most favorably to the plaintiff, she has only alleged a single incident of race-based discriminatory conduct, which does not meet the standard of severe or pervasive. While use of the "N-word" is completely inappropriate, a one-time use by a student constitutes juvenile behavior and is insufficient to demonstrate "severe" racial harassment. Also, it does not constitute "pervasive" discrimination, which the Sixth

---

financial statements and their designation as a Blue Ribbon School, which is a federally funded program. [Record No. 83-8 & 83-9] This is sufficient to meet the plaintiff's burden at this stage of the proceedings.

Circuit has held "means multiple incidents of harassment; one incident is not enough." *Kollaritsch*, 944 F.3d at 620.

Next, the plaintiff has not offered sufficient proof that the defendants were deliberately indifferent to the incident. The defendants' response to Doe's allegations are sufficient to demonstrate that the school took the allegations seriously. As outlined above the immediate response support the unmistakable conclusion that a thorough investigation was performed. And while the plaintiff may have preferred a different result, there is no requirement that "administrators . . . engage in particular disciplinary action[.]" *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).

Further, the plaintiff has not cited to any evidence that the school's response led to further racial harassment *because of* its actions or inaction. Doe claims that because the student was not disciplined, he started "going around … telling everybody I snitched on him, and that they weren't going to believe me." [Record No. 47] But again, taking the facts most favorably to the plaintiff, this does not support a claim of severe or pervasive *racial* discrimination as it is completely void of any racial connotation.

Finally, the plaintiff has not shown that Doe suffered an actionable Title VI injury. An actionable injury in this context is "the deprivation of access to educational opportunities or benefits provided by the school." *Kollaritsch*, 944 F.3d at 622. Here, the plaintiff has not offered any evidence to suggest that Doe incurred such injuries. There is no evidence that she was excluded from any events or opportunities, that she could not concentrate in class, or that her academic performance suffered.

**ii.**

Next, the plaintiff makes a teacher-on-student Title VI claim based on Hehman's actions during class.  Title VI "proscribes only intentional [race] discrimination*." M.J. by & through S.J. v. Akron City Sch. Dist.*, 1 F.4th 436, 453 (6th Cir. 2021).  To prevail, the plaintiff must show: (1) actionable racial harassment by the teacher; (2) actual notice of the harassment by an official with authority to take corrective action; (3) a clearly unreasonable response by the school; and (4) the school's deliberate indifference caused the plaintiff to suffer discrimination.  *Wamer v. Univ. of Toledo*, 27 F.4th 461, 471 (6th Cir. 2022).  A plaintiff suffers additional racial discrimination if "(a) the plaintiff experienced an additional instance of harassment or (b) an objectively reasonable fear of further harassment caused the plaintiff to take specific reasonable actions to avoid harassment, which deprived the plaintiff of the educational opportunities available to other students." *Id*.

In this case, the plaintiff's claim fails because she cannot establish that Hehman intentionally discriminated against Doe.  The plaintiff alleges that Hehman is responsible for two incidents of teacher-on-student harassment.  The first incident allegedly occurred on April 17, 2023, when Hehman asked the eighth-grade class, "do we have any black students in this school?"  [Record No. 47 at p. 35] The second incident occurred the following day when Hehman used the "N-word" as a part of a lesson on racial justice.  To succeed on this claim, the plaintiff must show that Hehman's actions were intentionally discriminatory.  However, the record demonstrates that Hehman did not know that Doe identified as African American until at least two days later when she met with Urlage.  [Record No. 70 at p. 53] Given that Hehman was unaware of Doe's racial identity, without more, there is insufficient evidence for a reasonable jury to conclude that Hehman statements constitute *intentionally* discrimination.

- 9 -

Further, the context in which Hehman used the "N-word" indicates that she was attempting to teach about racial prejudice and discrimination, not discriminate against an individual student.  In the same context during the lesson, Hehman used other slurs that refer to other minority groups with which Doe does not identify.  As ill-advised as the lesson plan may have been, there is no evidence that it was intentionally discriminatory.

But even if the plaintiff had offered evidence that Hehman's actions were intentionally discriminatory, she still cannot demonstrate that St. Joseph was deliberately indifferent to Doe's claims.  As outlined above, St. Joseph took the matter seriously, conducting an extensive investigation that consisted of meetings and interviews with Doe, Hehman, C.B., several students, and Doe's homeroom teacher.  [Record No. 73 at 29]  Such actions reflect not only concern regarding the incident but also a desire to address it in a responsible and appropriate manner.  And while school administrators found no wrongdoing by Hehman, Doe was moved from her class, Hehman apologized for the incidents, and a different chaperone was used for the class trip.  [*Id.*]  Additionally, the school also arranged for additional training regarding cultural diversity.  [*Id.*]  The actions taken following the subject incidents reflect concern and responsive action rather than indifference.

Likewise, the Diocese also responded to Doe's allegations. The superintendent performed her own investigation which included meetings with Urlage, Hehman, and an unrelated parent concerned about the incident.  [Record No. 74]  Following this investigation, the superintendent similarly found: (i) that while Hehman should not have used racial slurs in teaching on racial bias and discrimination, the teacher's actions were not intended to discriminate but, instead, to educate; and (ii) St. Joseph handled the matter appropriately.

Against this backdrop, the plaintiffs cannot demonstrate that the Diocese acted with deliberate indifference.

Finally, the plaintiff has not offered evidence to show that the defendants caused Doe to suffer additional racial discrimination or be denied educational opportunities. The plaintiff has not shown that Doe suffered any racial discrimination after April 18, 2023. The plaintiff argues that Doe was forced to avoid Hehman but could not completely do so, creating an awkward environment and thus depriving her of educational opportunities. However, while these encounters may have been uncomfortable for Doe, they do not constitute the deprivation of educational opportunities.

### B.

Regarding Count II, "[s]ection 1981 prohibits intentional race discrimination in the … making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Christian v. Wal-Mart Stores, Inc*., 252 F.3d 862, 867-68 (6th Cir. 2001). To prevail on a § 1981 claim, a plaintiff must show that: (1) he or she is a member of a protected class; (2) the defendant intended to discriminate against him or her based on race; and (3) the discriminatory conduct "abridged a right enumerated in Section 1981(a)." *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006). A plaintiff seeking to establish a § 1981 claim must prove intentional discrimination. *Id.* at 870. Intent, however, can be proven by "direct evidence or inferentially." *Amini*, F.3d at 358.

The parties do not dispute that Doe is a member of a protected class. However, they dispute whether the plaintiff can show that a contractual right was abridged. In the present case, the plaintiff has offered sufficient evidence that a contract existed between the parties.

C.B. paid Doe's tuition to attend St. Joseph and the parties agreed to the terms of the student-parent handbook prior to Doe's enrollment.  This is sufficient to establish a contractual relationship between the parties which would be actionable under § 1981.  *See Fennell v. Marion Indep. Sch. Dist.,* 804 F.3d 398, 409 (5th Cir. 2015) (holding that a student's Section 1981 claim could proceed where tuition payments established a contractual relationship).

Thus, the central question becomes whether the plaintiff has shown evidence of racial discrimination. The defendants contend that the plaintiff cannot show Doe was discriminated against either by either direct or circumstantial evidence.  [Record No. 75-1 at p. 27] In response, the plaintiff argues that the defendants failed to discipline students and teachers who harassed Doe.  But as previously discussed, school officials investigated Doe's claims and took remedial actions based on the conclusions reached by the investigation.  Upon learning of the purported first incident involving another student, Urlage promptly investigated the allegations. Further, the plaintiff has not offered evidence tending to show that the investigation or subsequent determinations were motivated by Doe's race.

Likewise, the plaintiff has failed to offer circumstantial evidence of discrimination. Again, the record shows that the defendants performed a full investigation in an effort to determine whether Doe's complaints could be substantiated, and if so, whether discipline was warranted.  Several individuals participated in the investigation and represented to C.B. and Doe's stepfather that the school took the allegations seriously.  Despite the investigation, school officials could not substantiate the allegations and, consequently, did not discipline the other student.  Next, notwithstanding the context, the school acknowledged that Hehman's use of the "N-word" during class was inappropriate.  The school concluded that use of the work occurred during an ill-conceived lesson but without any intent to discriminate.

The plaintiff contends that the school's investigations and subsequent findings of no discriminatory intent were a "pretext that masks [a] true discriminatory intent. *Amini*, 440 F.3d at 359-60. They argue that the school's response was "grossly inadequate." However, even though the school found there was no discriminatory intent by Hehman, the defendants took steps to prevent Doe from feeling uncomfortable by moving her to another English class and removing Hehman as a chaperone on a field trip. The school also added training to ensure its faculty would be better equipped to respond to similar future events. This action does not an inference of intentional racial discrimination. And even if the plaintiff's allegation that the decisions taken by the school showed "incompetence in managing the situation," they do not show discriminatory intent.

## C.

The plaintiff contends that St. Joseph and the Diocese violated the Rehabilitation Act by failing to protect Jane Doe from disability-based harassment and discrimination. The Act holds that a disabled person shall not, "solely by reason of her … disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program … receiving Federal financial assistance." 29 U.S.C. § 794(a). As a threshold matter, to prevail under the Act, the plaintiff must show that the defendants are recipients of federal funding. *Ewbank v. Gallatin County, Ky.*, 2006 WL 197076, at *4-5 (E.D. Ky. Jan. 17, 2006). Then, the plaintiff must demonstrate that: (1) Doe was harassed solely by reason of her disability; (2) the harassment was severe and pervasive enough to alter the condition of her education and create an abusive educational environment; (3) the defendants knew about the disability-based harassment; and (4) the defendants were deliberately indifferent to it. *K.C. v. Cnty. Schs.*, 306 F. Supp. 3d 970, 977 (W.D. Ky. 2018), 762 Fed. App'x 226 (6th Cir. 2019).

The plaintiff has offered sufficient evidence that the defendants receive federal funding. Thus, the next question is whether the plaintiff has offered evidence that Doe was discriminated against based on her disabilities. *M.J. by & through S.J. v. Akron City Sch. Dist.*, 1 F.4th 436, 452 (6th Cir. 2021). To prevail on a claim of disability discrimination, the plaintiff must "present evidence of how the school treated comparable, non-disabled students." *M.J.*, 1 F.4th at 453.

Here, the plaintiff has shown that Doe suffers from dyslexia and a nonverbal learning disorder; however, no evidence has been offered to demonstrate that non-disabled students were treated differently. The record lacks any evidence that Doe was discriminated against because of her disabilities. Instead, the plaintiff contends that her alleged disparate treatment was due to her race, not her disabilities. The instances to which the plaintiff points in support of the claim of disability discrimination occurred after the two incidents involving the use of a racial slur. She asserts that Doe was targeted and labeled as "a liar, a snitch, and ridiculed" and further contends she was the only student denied the opportunity to properly receive communion. [Record No. 83 at p. 31] But even taking these facts in the light most favorable to the plaintiff, none of the events relate to Doe's disabilities.

Likewise, the plaintiff cannot show severe and pervasive disability-based harassment such that it altered the quality of Doe's education. Doe's testimony regarding fear and anxiety experienced at school does not evidence disability discrimination. In fact, the plaintiff fails to allege how the events she describes (i.e., having to encounter Hehman and uncomfortable interactions with her), even if true, relate to her disabilities.

And no evidence has been presented which indicated that the defendants were either on notice of the disability-based discrimination or were deliberately indifferent to it. In her

- 14 -

response, the plaintiff claims that "C.B. clearly articulated her concerns to the school after the first incident involving the student who called Jane a racial slur, specifically warning that Jane's disability made her susceptible to retaliation. Despite this, Defendants failed to take any proactive measures to ensure Jane's safety, nor did they attempt to document or address C.B.'s concerns in any meaningful way." [Record No. 83 at p. 34] However, the issue is not whether the school was aware that Doe had a disability. Instead, it is whether the defendants were aware that Doe was being discriminated against because of her disability. In an effort to demonstrate discrimination based on Doe's disability, the plaintiff conflates the racial incidents as those involving disability. The Plaintiff has clearly alleged that Doe experienced discriminatory treatment because of race, but she has offered no evidence that any of the alleged discriminatory treatment was based on her disability.

### D.

The plaintiff has advanced several theories of negligence relating to the school's alleged failure to prevent harassment by Hehman and the defendants' alleged failure to respond to Doe's complaints. Under Kentucky law, a plaintiff seeking to prevail on a negligence claim must show: (1) a duty owed from the defendant to the plaintiff; (2) a breach of that duty; (3) injury to the plaintiff; and (4) causation between the breach and the injury. *N.P. v. Kenton Cnty. Pub. Sch.*, 2023 WL 1822833, at *9 (E.D. Ky. Feb. 8, 2023). A school owes a duty to its students to provide a safe school environment, but it is not an "insurer[] of children's safety and must only be reasonably diligent" in upholding this duty. *Id.*

First, the plaintiff cannot show the defendants were negligent in their oversight of Hehman. On May 10, 2024, that Hehman did not commit an underlying tort. [Record No. 30]

Thus, would be illogical to hold St. Josephs, the Diocese, or Reinersman liable under the theory that they were negligent in their efforts to oversee Hehman.

Second, the plaintiff cannot demonstrate that the defendants were negligent in their investigation of the alleged incidents. As previously discussed, St. Joseph responded to the plaintiff's complaints. Upon learning that a classmate used the "N-word" in speaking to Doe, the school promptly investigated the matter. And when school officials learned of the incident in Hehman's class, they took action to protect Doe and prevent her from feeling uncomfortable to the extent reasonably practical. This included removing Doe from from Hehman's class, removing Hehman from a class trip, requiring additional training regarding diversity, performing an investigation which included numerous meetings and interviews, and forwarding an apology from Hehman to Doe. The plaintiff acknowledges these actions but contends that the defendants failed to regularly communicate with her regarding the status of the investigation. But once again, the record demonstrates that she and C.B. had multiple meetings with school administrators and was in regular contact with school officials via phone and email. And even if this was not the plaintiff's preferred method of communicating about the matter, it does not constitute a legal breach of any duty owed to her. In short, the school fulfilled its obligation to investigate the allegations and was reasonably diligent in its efforts to provide Doe a safe learning environment.

The plaintiff also argues that the defendants' reliance on *S.S. v. E. Ky. Univ.*, 532 F.3d 445 (6th Cir. 2008), is misplaced because, in that case, the school "took prompt, documented, and substantial steps to discipline students, separate the victim from harassers, and implement broader educational measures to prevent further harm." [Record No. 83 at p. 38] Yet, St. Joseph took many of the same steps, investigating the claims, implementing additional

- 16 -

training, and isolating Doe from Hehman.  Urlage also discussed the investigations with C.B., both in person and over the phone.  [Record No. 73 at p. 17; 83-4] In this case, the school determined that discipline was not warranted, and its response was proportional to the events.

Finally, even if the plaintiff could show a breach of duty, she has not shown that Doe "suffered emotional injuries" because of the defendants' purported negligence.  To recover for emotional distress on a negligence claim, the injury must be "severe" or "serious."  *Juarez v. Schilling*, 668 S.W.3d 225, 240 (Ky. App. 2023) (citing *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012)).  And a plaintiff seeking to recover such damages must present "expert medical or scientific proof to support the claimed injury or impairment." *Id*. at 241.

Here, the plaintiff's evidence in support of alleged injuries stems from treatment records provided by Emily Boston, who provided therapy to Doe and C.B. in response to the incidents.  The plaintiff alleges that the treatment records establish both the existence and severity of their emotional injuries.  [Record No. 83 at p. 39] However, the plaintiff's claim fails because she did not provide expert evidence from Boston or any other proposed expert, and the deadline to identify expert evidence passed on September 19, 2024.  The parties acknowledge Boston was never deposed in this matter, with plaintiffs specifically noting "Defendants chose not to depose Ms. Boston despite having the opportunity to do so." [Record No. 83 at p. 39]  The defendants correctly point out that it is not their burden to solicit testimony to establish a prima facie case of negligence.  Instead, that burden resides with the plaintiff, and it has not been met in this case.

**V.**

Based on the foregoing analysis and discussion, it is hereby

- 17 -

**ORDERED** that the motion for summary judgment filed by Defendants Diocese of Covington, St. Joseph Catholic Church, and Gerald Reinersman [Record No. 75] is **GRANTED**.

Dated: June 16, 2025.

<u>Danny C. Reeves, District Judge</u>
United States District Court
Eastern District of Kentucky